Leonard J. BRENNAN et ux.
Jane Brennan,

v.

SOCONY MOBIL OIL COMPANY, Inc.

Civ. A. No. 64–C–40.

United States District Court
S. D. Texas,
Corpus Christi Division.

June 10, 1966.

Ellis & Andrews, William L. Ellis, Aransas Pass, Tex., and M. K. Bercaw, Jr., Freer, Tex., for plaintiffs.

Roy L. Merrill, Houston, Tex., and Fischer, Wood, Burney & Nesbitt, Allen Wood, Corpus Christi, Tex., for defendant.

## MEMORANDUM

GARZA, District Judge.

This is a suit by the owners of the surface estate of a tract of land in Duval County, Texas, against the owner of seven-eighths of the mineral estate. Plaintiffs seek compliance by the Defendant, or, in the alternative, damages for failure to comply, with the terms of a mineral deed executed by the original owners of the entire estate to Defendant's predecessor in title to seven-eighths of the mineral estate.

The Defendant originally filed a motion for summary judgment which attacked the Plaintiffs' standing to require compliance with the terms of the mineral deed or to seek damages for their breach. By prior Memorandum and Order, this Court denied said motion, holding that the Plaintiffs, as owners of the surface estate, had the right to enforce the provisions of the 1926 mineral deed to Defendant's predecessor.

The case was tried to the Court, and after extensive testimony was heard, the parties were allowed to submit written briefs.

By their suit, the Plaintiffs seek to compel the burial of pipelines over Plaintiffs' land to be tilled below plow depth; to compel Defendant to remove all abandoned concrete foundations from Plaintiffs' land, or to recover damages in the alternative; and to recover damages sustained by the Plaintiffs as a result of Defendant's failure to bury such pipelines and remove the concrete foundations when requested to do so, and to recover exemplary damages.

The land in question here is a 3009 acre ranch, and the Plaintiffs, by appropriate instruments, have shown that they are the owners of the surface. This Court has previously held that they are entitled to enforce the provisions of the original mineral deed from A. Weil and wife, Flora Weil, to Magnolia Petroleum Company, predecessor in title to the present defendant, Socony Mobil Oil Company, Inc., under date of March 17, 1926.

The 1926 mineral deed from Weil, et ux, to Magnolia contained the following express language:

"* * * on Grantor's request all pipelines laid across any of said land to be tilled shall be placed below plow depth, and Grantee shall pay reasonably for any damage done to crops, live stock fences, or other improvements belonging to Grantor by reason of operations hereunder. The use of the surface of the land is hereby granted only so far as may be necessary to conduct said drilling or mining operations hereunder, including the

searching for, producing, saving, storing and transporting of said minerals, and shall in no manner interfere with the use of the lands for grazing purposes, except herein granted and stipulated.

"It is agreed and understood that no subdivision or sale of the oil or mineral rights herein conveyed shall be made by Grantee. * * *"

The Plaintiffs herein have been using this ranch for the raising of cattle. The land is such that in its present state it cannot support but one animal unit, which has been defined as a cow with her calf until weaned, to every thirty acres of land. The Plaintiffs contacted the Soil Conservation Service of the Department of Agriculture, and a study was made by said Service under which the Plaintiffs would root plow approximately 2200 acres of the 3009 acres on the ranch. After root plowing, the land would be raked to get rid of and burn all loosened roots, etc. The raking process would disturb the soil and allow it to be planted in Buffelgrass or Blue Panic grass. It was estimated that if this conservation plan was put into practice, the land would sustain one animal unit to every ten to twelve acres of land.

By late 1960 or early 1961, the conservation plan had been pretty well determined. The Plaintiff Brennan contacted representatives of the Defendant on several occasions, requesting that lines and structures no longer in use be removed from his land by the Defendant, and asking that pipelines still in use be buried so as not to interfere with the root plowing and raking processes contemplated under the conservation plan. He did not meet with any success, and on July 27, 1962, he wrote a letter to Mr. E. E. Campbell, Producing Superintendent of the Defendant, requesting specific performance under the terms and conditions of the 1926 mineral deed. In said letter he requested the following:

"1. That pipe lines owned by your company which are no longer in use be removed.

"2. That structures and the remaining portions of those structures owned by your company and no longer used for the production, storage, or transportation of oil, gas, or minerals as provided in the mineral deed be removed, and any adverse effect to grazing or agricultural use of the surface by reason of their existence or removal be alleviated.

"3. That pipe lines owned by your company and presently in use be buried in accordance with the terms of the mineral deed.

"4. That any other occupancy of the surface that in any manner interferes with grazing or agricultural use of the surface, except as provided for in the subject mineral deed, be terminated."

Mr. Campbell answered the letter of July 27th by his letter of August 22nd. After acknowledging receipt of the letter of July 27, 1962, Mr. Campbell informed Mr. Brennan as follows:

"We have carefully reviewed the terms of the mineral deed and of our operations on the premises and are of the opinion that we have fully complied with our legal obligations under the terms of said deed. We will, as a matter of courtesy to you, remove pipe lines which are not being presently used and for which we can see no future use. We will also clean up the old derricks that have been pulled over and remove other abandoned equipment from the land. We are not obligated by the terms of our grant to remove concrete foundations and we do not propose to do so. As to pipe lines currently in use which are laid across any of the land which is to be tilled, we will place them below plow depth. In connection with this, we do not consider root plowing and brush removal as tilling of the land."

The answer of Mr. Campbell joined the primary issue which is to be decided by this Court: Whether the proposed conservation plan program constitutes *tilling* the land.

The Defendant's main contention is that the Plaintiffs are not going to till the land because they are not going to cultivate it for crops; that root plowing, brush removal, raking and planting of grasses is not the *tilling* contemplated under the 1926 mineral deed.

There is no question that modern cattle raising necessitates the planting of grasses other than native grasses in order to increase the capacity of the range to sustain animal units.

Mr. Robert F. Pierson, Jr., a conservationist with the Soil Conservation Service of the United States Department of Agriculture, testified that when a plan such as contemplated for the Brennan ranch was put into effect, they considered the planting of grass like the planting of oats or corn or anything like that. When you go to plant other than native grasses, you cannot just throw the seeds on the ground; that the soil must be disturbed first. One of the ways of disturbing the soil is by raking, because the raking process after a pasture is root plowed stirs the crust or the surface of the soil.

█ Mr. C. W. Brodnay, Jr., Farm Manager for Texas A. & I. College, testified in behalf of the Defendant. During his testimony, this Court asked the witness, "Well, you know what they do here. The grazing programs they have, or these grazing practices, they root plow it, then they rake it. When they rake it, they break up a little crust, and then they bed it with seed. Would you consider that operation a tilling of the soil for that purpose?" And his answer was "Yes, sir." He tried to qualify his answer to the Court by saying that after the root plowing the land would have to be cultivated with a tractor, etc., but from his answer to the Court and from the testimony of Mr. Pierson, I find that root plowing, raking and planting of perennial grass seeds is *tilling* the soil, as contemplated under the 1926 mineral deed.

*Tilling* does not necessarily mean farming as such. Any time that you must disturb the surface of the soil in order to plant seeds and get those seeds to grow, constitutes *tilling* of the soil.

We must remember that the 1926 mineral deed also said that the Defendant "shall in no manner interfere with the use of the lands for grazing purposes, except as herein granted and stipulated."

The parties in 1926 contemplated that the land involved would be used for grazing purposes; and, as already stated, modern practices require that other than native grasses be planted, and this cannot be successfully done unless the crust of the soil is disturbed so that the seeds of the grasses to be planted may grow. It is this disturbing of the crust of the soil that constitutes the *tilling* that the Plaintiffs want to do. The grass seed planting that the Plaintiffs want to do would be of no avail if the brush is not first cleared.

The Defendant makes the contention that in 1926 root plowing, as such, was unknown, as this practice was not instituted until many years thereafter when first used on the King Ranch.

This contention is good as to the depth that the lines must be buried, but is of no avail to the Defendant in showing that the planting of other than native grasses is not tillage of the soil. The ordinary plow depth as contemplated by the parties in 1926 was twelve inches. The depth of root plowing depends on the type of brush being removed, and sometimes has to be twenty-four inches deep in order to remove the necessary roots. On the Brennan ranch, it will take from twelve to fourteen inches.

Evidence from people engaged in the root plowing business shows that because of the danger involved, most contractors will not root plow land that has pipelines on the surface, and especially like those located on the Brennan ranch, where some of the lines are partially covered and hard to find. One such contractor testified that he would do it, but would have to charge a higher price because of the existence of the lines that the Plaintiffs want buried.

■ I, therefore, hold that the Defendant must bury its pipelines and pay the expense of burying the same twelve inches and no more. If the Plaintiffs want the lines buried deeper than twelve inches, they must pay for the difference, and must be given this opportunity or else the contract becomes meaningless.

The evidence showed that there remained on the land of the Plaintiffs the foundations from nineteen abandoned oil wells, plus four power unit foundations; that two of the power unit foundations are thirty-two feet by eighty feet, and two are twenty feet by forty feet. At the site of each abandoned well, there are four foundations for derricks, each twenty-four inches square, and also a concrete block for the jack to sit on, three feet by eight feet; and even though they do not cover much ground there is no question that they are interfering with the grazing of cattle.

The Defendant contends that it is under no duty to restore the surface to the condition it was in prior to the commencement of work, after drilling operations have been terminated and the premises abandoned; and cites Warren Petroleum Corp. v. Monzingo, 157 Tex. 470, 304 S.W.2d 362. However, the *Monzingo* case recognizes that the surface easement of the mineral estate may be limited by express language in the conveyance, as where surface damage clauses are included in oil and gas leases.

■ The Defendant is still operating the lease on the premises. The structures sought to be removed are not being used by the Defendant for any purpose, and there is no question that even though the area they cover is small, they are interfering with the use of the land for grazing purposes, which is strictly prohibited under the terms of the mineral deed of 1926. The Defendant must, therefore, remove those structures.

The Plaintiffs claim damages because of the delay in putting their conservation plan into effect, which they blame on the refusal of the Defendant to bury its pipe-lines as requested. These damages, they claim, amount to the loss of profits from the anticipated increase in Plaintiffs' calf crop which would have occurred had the Defendant complied with its obligation to bury the pipelines so that Plaintiffs could carry out their improvement program. The Plaintiff Brennan testified that his calf crop in the year 1964 was seventy-four calves from eighty-nine cows, or a calf crop of some eighty-three per cent.

Lee Gates, a rancher in the general area, testified that in the Duval County area most ranchers can expect to produce an annual calf crop of eighty to eighty-five per cent, and that calves coming from improved ranches would be in better, fleshier condition and, therefore, produce more money since they are sold by weight. He further testified that his records showed that the average price received for his calves in 1962 was $105.00; in 1963, $99.00; in 1964, $78.00; and in 1965, $102.00.

The Plaintiff Brennan testified that his calves in 1965 brought $79.97 net after shipping; that if he had been allowed to put his conservation plan into practice, he would have been able to run enough animal units on his ranch to have had approximately two hundred forty calves, instead of the eighty he can now produce; and further testified that his fixed expenses would increase after putting the plan in operation from approximately $4474.00 to $7474.00, and that his gross profits would have increased by almost $10,000.00 a year.

The fact remains, however, that there were many parts of the ranch that he could have root plowed, raked and planted grasses in spite of the unburied lines, which he did not do. There is no question, however, that the delay in putting the conservation plan into practice because of the refusal of the Defendant to comply with the terms of its mineral deed, has caused Plaintiffs some damages; and even though they be speculative, there is evidence in the record to make a finding of some amount of damage.

17 T.J.2d, § 143, at p. 210, states:

"But it is recognized that the profits that would have been earned but for the breach of a contract are in their very nature somewhat conjectural and speculative, and the injured party will not be deprived of his remedy solely because of the difficulties lying in his way of proving his damages. Thus it is not necessary that the profits should be susceptible of exact calculation, and it is sufficient if there are data from which they may be ascertained with a reasonable degree of certainty and exactness."

■ Here there is uncertainty as to the extent of the damage, but there is none as to the fact of damage. The conservation plan, if commenced when the Plaintiffs wanted to commence it, would have taken some three to four years to complete. I find, however, that because of the failure of the Defendant to comply with the request of the Plaintiffs, they were damaged in 1963 the sum of $1140.-00; in 1964, they were damaged the sum of $1590.00; in 1965 they were damaged the sum of $1960.00; and in 1966 to the present, they were damaged the sum of $970.83, or a damage total of $5560.83.

■ This is not a case for exemplary damages. In the first place, there was a genuine dispute as to the duty of the Defendant to bury the pipelines because of the conservation plan of the Plaintiffs. Secondly, communications between the Plaintiffs and the Defendant show that offers of cooperation were tendered the Plaintiffs by the Defendant, including the temporary removal of the lines to allow the root plowing. Exemplary damages are, therefore, denied.

This Memorandum is and constitutes the Findings of Fact and Conclusions of Law of the Court.

Attorneys for the Plaintiffs will prepare an appropriate decree for entry.

Clerk will make available to the parties copies of this Memorandum Opinion.